# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BERRY PETION | * | |
| Plaintiff | * | |
| v | * | Civil Action No. CCB-17-2842 |
| MARYLAND STATE POLICE, et al. | * | |
| Defendants | * | |

\*\*\*

## MEMORANDUM

The Maryland State Police, Sgt. Sean L. Harris, Trooper First Class Jacob R. Burno, Trooper First Class Michael A. York, Corporal Michael S. Cox, and Trooper First Class Charles M. Tittle (collectively "State Defendants") filed a motion to dismiss in response to this civil rights complaint against them. (ECF No. 26.) The Elkton Police Department and Officers Ziegenfuss and Hoffman (collectively "County Defendants") moved to dismiss or for summary judgment in response to the claims asserted against them. (ECF No. 28.) Plaintiff Berry Petion opposes both motions. (ECF No. 31.) No hearing is required to resolve the matters pending before the court. *See* Local Rule 105.6 (D. Md. 2016). For the reasons below defendants' motions shall be granted and the complaint shall be dismissed.

### Background

In his complaint, as supplemented, Petion alleges he has been systematically harassed and targeted for stops by Maryland State Troopers and the Elkton, Maryland police. (Compl. at 2, ECF No. 1.) Petion describes "a state trooper" following him through the town of Elkton when he was on his way to work in Pennsylvania. (*Id.* at 3.) He claims he was followed "well into the State of Delaware" and after ten to fifteen minutes of being followed, the State trooper turned on

his emergency lights signaling Petion to stop. (*Id.* at 3.) Petion stopped off a ramp on Interstate 95 in Delaware. (*Id.*)

He claims the officer's "aggressive handling caused the reinjury of [his] right knee" and his right shoulder was popped out of joint. (*Id.*) Petion claims that he provided no resistance and complied with commands he could hear over the noise of the traffic. He states that he complained about the pain being inflicted upon him as the officer searched him, but his complaints were ignored. (*Id.*)

During this stop Petion claims that Delaware State Police saw what was happening and asked what was happening. The Maryland State Trooper explained that Petion had stolen the car and did not have a license to drive. Petion states that the Delaware troopers told the Maryland officer that he was "far from Maryland and should and could not be making the stop." (*Id.*) When the Delaware officers ran Petion's plates they reported that everything came back clear with nothing negative registering on their database. (*Id.*)

The Maryland trooper who stopped Petion was joined by another female officer from Maryland and, after speaking in private, they left the scene without providing Petion with the name of the officer who stopped him. (*Id.* at 3-4.) He claims he was left in handcuffs which were cutting off his circulation and could not be removed by the Delaware officers. The Delaware officer contacted a supervisory officer in Maryland and had the trooper return to the scene to remove the handcuffs. Although the Delaware troopers directed Petion to a nearby hospital for his injury, he states that he went to his job instead. He claims he was fired from the job because he was tardy to an event that night he was promoting that night worth over $12,000 in pay. He alleges he still has pain to his knee and shoulder and requires surgery to correct the damage. In addition, he states he has PTSD and anxiety. (*Id.* at 4.)

When Petion contacted the Maryland State Police and asked about filing a complaint with internal affairs he claims he was told there was no such thing and that "they would simply look into this matter." (*Id.* at 4.) He states that he spoke with a lieutenant who was supposed to help him file a complaint, but later that week Officer Harris of the North East barracks pulled him over and harassed Petion about filing a complaint. Petion alleges that Harris threatened that "no good would come of this." (*Id.*) Petion states that "as promised" Harris contacted Petion's "P.O." in Pennsylvania and had a warrant put out for his arrest. (*Id.*) He claims that Harris and his partner then obtained a copy of the warrant and began stalking Petion in order to get him put into custody in Chester County, Pennsylvania so that Petion could not move forward with the internal complaint. (*Id.*)

Petion claims he was stopped three more times, which he states he recorded and posted to his social media account because he was afraid the officers would try to kill him. (Compl. at 5.) Petion's wife, Denise Petion, called the Maryland State Troopers' North East Barracks, presumably to complain. Petion alleges that his arrest by Pennsylvania authorities was arranged by Maryland State Troopers in order to insure his complaint would go nowhere. (*Id.*)

Petion states that Officer Harris and his partner came onto his property and were looking at his cars and ATVs, writing down "useless information hoping to discover something." (*Id.* at 5.) Petion states he came out of his house to address the officers after seeing them on his home security monitor. He claims the officers accused him of swapping tags from an old vehicle to a new one and Petion replied it was done legally. Petion states that Harris called him a liar and warned that he "better not catch [Petion] driving this piece of shit." (*Id.*) Earlier that day Harris had accompanied Petion's probation officer on a routine home visit. (*Id.*)

3

On unspecified dates Petion was stopped two more times for traffic violations. (Compl. at 6.) He claims that Harris "again stalls my life by calling my P.O. in PA and request[ing] he put out a warrant for my arrest, stepping once again out of line." (*Id.*) Petion was arrested on the warrant and lost his job paying $25 per hour. He claims that Harris and his partner got the warrant sent to them personally "just to stalk me and make the arrest" and told Petion, "you should just get your shit and get out of Cecil County." (*Id.*)

On an unspecified date Harris came to Petion's home, which was recorded on Petion's home surveillance equipment. When Petion's wife went out to confront the officers, Harris asked if Petion still had swapped tags on their vehicles. Petion's wife then presented paper work to Harris which Harris returned to her prior to leaving without further action. Petion claims that Harris continues to drive up and down their dead-end street. (*Id.*)

On an unspecified date, Petion states that Harris impounded his ATV because someone had tried to steal it and it needed to be processed for fingerprint evidence. Petion argued that it was impossible to steal the vehicle since it was out of gas and Petion had the key, but the officers insisted on taking it with them. (*Id.* at 6-7.) They told Petion that he would be able to get it back after two to three days, but a week later when Petion called he was given excuses about why he could not get the ATV back. (*Id.* at 7.) When Petion went there to get his vehicle back on a date unspecified he was arrested by an Elkton Police officer on a warrant for driving without a license. He states he "returned after the commissioner deemed this ridiculous" but was still "given the run around." (*Id.*) When Petion called Harris's supervisor he states that the supervisor told him that Harris and his partner were "in the right" and they were investigating whether Petion had stolen the vehicle. (*Id.*) Petion was then told he must bring in "proof of sale" to prove the ATV was his. (*Id.*) He claims he kept calling "internal affairs" and going to

4

the barracks until he got his property returned two and a half weeks later. Petion determined that the vehicle had been completely disassembled while in the custody of the State Police and it had been assembled incorrectly, with missing screws and broken brackets. He states that it cost him $200 in repairs and that the value of the ATV dropped by $670. The confiscation also kept Petion from entering a race with an award of $2000. (*Id.*)

With regard to the Elkton Police Department, Petion relates that the first incident he can remember involved a female officer whom he does not name and who on an unspecified date pulled him over and accused him of trying to run into her car with his car. (Compl. at 8.) On another date unspecified Petion states that the Elkton Police used two cars to stop him, called a K-9 unit to walk around his "new 2016 Dodge Mustang tearing the leather seats and breaking the glove compartment." (*Id.*) During the search Petion claims the officers asked him how much dope he had to sell to purchase the car. Petion claims it was one of the coldest days of the month and he was made to sit on the side of the road handcuffed while officers laughed. Nothing was found, but Petion states they gave him a ticket anyway. (*Id.*)

On another unspecified date, Petiton states that he was on his way home when "an unmarked car and several marked ones came to a screeching hault [sic] directly in front of me." (Compl. at 8.) Officers exited the cars with guns drawn and told Petion they would shoot if he moved; Petion and the passenger in his car had their hands up. He states that first officer came to the driver's side door and shouted "Don't fucking move," and held a gun to Petion's face. (*Id.* at 9.) Petion noticed the gun was ready to fire and was not "on safety." (*Id.*) A second officer came to the passenger side door with his gun drawn and commanded that the car be put into park and the key removed from the ignition. (*Id.*) Petion claims that at least five officers were all screaming orders and he was reaching for the key as ordered when the officer at the driver's side

5

door pushed his gun through the window and said he was going to shoot Petion, but the officer on the opposite side of the car said he had told Petion to hand him the keys. (*Id.*) Petion states his wife and kids and his neighbors watched as police dragged Petion and his passenger from the car across the ground, handcuffed them, and threw them into the police cars. (*Id.*) He states this was done after the officers found less than a gram of marijuana in the car. During the search Petion claims that officers ripped the carpet and cut the seats in the car, broke the turn signal switch, broke the passenger side visor, and broke the glove compartment. The officers claimed there had been a call about Petion pointing or brandishing a gun. After the search of Petion's car did not locate a gun, he states he and his female passenger were taken to the police station where they were strip-searched. Again, nothing was located and Petion was given a citation for marijuana possession and allowed to leave. (*Id.*)

Petion was stopped on two more occasions (dates of those stops not provided) on the street where he resides. (Compl. at 10.) He claims that although the officers who stopped him had stopped him before, they asked him why he was in the area despite the fact that Petion had told them multiple times he lived there. (*Id.*)

Petion claims that the Elkton Police drive around the town recklessly and that he had been documenting this practice for an article he intended to publish on his blog. Unnamed officers from both the Elkton Police and the Maryland State Police told Petion he was not allowed to record police and made attempts to stop him from doing so by taking his phone or recording device. (*Id.*) Petion states this continued "even after [he] advised them [he] was a public figure and only interested in public safety and my own [safety]." (*Id.*)

On a date unknown, Petion states he spoke with a female lieutenant with the Elkton Police, who was dismissive of his claims that officers harassed him. (*Id.*) He claims she told

6

him that all of the officers indicated they would stop him because he did not have a license. When Petion asked if she would "call them off" if he could prove he had a license, he claims she said it was more complicated than that. (*Id.*) The officer then informed Petion that there was no such thing as "internal affairs," that she was the final stop for a complaint, and she had determined that all the stops in which Petion was involved in were legitimate. (*Id.* at 11.) Petion adds that before disconnecting the call he told the officer that Officer LaSalsa said that his "'kind wasn't wanted around here[,]' with a racial undertone." (*Id.*)

Petion states that "two weeks later" on a date he does not specify, his father-in-law's house was raided by Elkton and State Police in execution of a warrant which Petion alleges was not supported by any "real information." (Compl. at 11.) He states the home was not his legal residence, but was staying there and his name was the only name on the warrant. He further alleges that the search turned up a legal handgun and drug paraphernalia located in a different room from his, but the police charged him with it. Following his arrest, he claims police used the newspaper and social media to claim he was drug kingpin supplying drugs to Cecil County so that the jury pool would be poisoned. (*Id.*) He claims he was told if he didn't "take these charges" his "wife, children, and sick father-in-law would be dragged into this." (*Id.*) Petion "took the misdemeanor charges and agreed to assist the DA office for a decent deal." (*Id.*) Petion claims that he tried to assist a task force, but after calling nine times he was contacted and told they did not want to work with him. (*Id.* at 11-12.)

On another unspecified date Petion was stopped and given a citation because he had a "slim light bar" on his car that the Elkton Police officer said was too bright for public roadways. When Petion gave the officer his documents, the officer told him he knew Petion's license was suspended and rejected the paper Petion presented that stated his license had been reinstated as

7

old. (Compl. at 12.) Petion received a ticket and the officer told him to call someone to come get him and that Petion should not drive the car. (*Id.*) Petion went to court for the ticket and when the prosecuting attorney disputed Petion's case, he asked for a trial which angered the charging officer. Petion states he was afraid the officer would retaliate against him so he recorded his walk to the car after court and saw the officer in the parking lot of the courthouse in his car waiting. (*Id.*) Petion drove his car home without the officer following him, but when he went into the North East State Trooper's Barracks to file a complaint about Trooper Harris, he was arrested because the officer filed a warrant against Petion for driving without a license. (*Id.*) As relief Petion seeks damages of three million dollars, an order clearing all charges from his criminal record, and "PFA[1]" for Petion and his family. (Compl. at 15.)

In his supplemental complaints Petion names additional police officers as defendants and labels his causes of action against the police departments named as well as the municipalities. (*See* Supplements, ECF Nos. 4, 5, 19, and 24.)[2] He describes conduct by Maryland State Troopers Bruno, Harris, Cox and York, but does not state when the conduct occurred. (ECF No. 4.) He claims that Bruno used harsh language, trashed his car, and stops Petion often to ask him what he's doing. (*Id.* at 2.) Petion claims Harris asked him why he and his family doesn't move and stated that as long as Petion lives in Harris's neighborhood, Harris will be "on his 'ass.'" *Id.* Harris also allegedly told lies about Petion to Petion's probation officer, questioned Petion about his complaint against other officers, and took his ATV for an unstated number of weeks and returned the vehicle damaged. (*Id.*) Petion admits that Cox has "never directly harmed me" but he claims Cox stands by while criminal acts against him take place. (*Id.*) Officer York is alleged

---

[1] Petion does not explain what "PFA" means.
[2] For clarity, each of the supplements will be cited by its ECF number.

to "always [have] a racial under tone" when speaking to Petion and to have searched Petion's car without probable cause. (*Id.*)

The Elkton Police officers, Zeigenfuss and Hoffman are also accused by Petion of harassment. (ECF No. 4 at 3.) He claims Zeigenfuss "uses racial tones to show [Petion] how much she does not like [him] and [his] wife. Petion claims Zeigenfuss told him that his relationship with his wife and their kids are a "joke" and that she hopes both go to jail. He also claims she has followed him in an unmarked car. He further alleges that on an unspecified date, following a court hearing, Zeigenfuss stated very loudly outside of the court house that Petion should "make sure you pick up your phones we took during the raid" because they "were done going through them." (*Id.*) Petion alleges that Hoffman uses his badge to issue tickets of all sort, stalks Petion, and had an arrest warrant for driving without a license issued for Petion following a court hearing where Petion challenged a ticket issued by Hoffman. (*Id.*) He further alleges that Hoffman called him a "dealer" because he fits the profile. (*Id.*)

In his second supplemental complaint Petion raises claims against the municipalities of Elkton and North East, Maryland for failing to warn the community of abuses by police and failing to eliminate, repair and/or maintain the defective police departments. (ECF No. 5 at 4 -5.) He also states the municipalities are liable for false imprisonment, emotional distress, loss of his job, and malicious prosecution. (*Id.* at 5-6.) He states he was prosecuted with "undue haste" and without a factual basis. (*Id.* at p. 7.) He concludes he was detained in the Cecil County and Chester County Detention Centers because of the malicious prosecution and seeks money damages as relief. (*Id.* at 8-9.)

Petion adds a claim of intentional infliction of emotional distress, but does not describe the conduct attributable to this cause of action beyond incorporating his previous statements, nor

does he describe his emotional injury. (*Id.* at 9-10.) He also adds claims under 42 U.S.C. §§1981, 1983, and 1985 against all named defendants, alleging there was a conspiracy to violate his Fourteenth Amendment right to equal protection and a policy or custom for the cities to tolerate racial discrimination by police. (*Id.* at 10-11.)

In his third supplemental complaint Petion adds claims for unlawful arrest in violation of the Fourth Amendment, excessive bail, violation of his First Amendment right to free speech, racketeering conspiracy, assault and battery, reckless endangerment, and abuse of due process without any further details surrounding these calaims. (ECF No. 19 at 3.) Petion includes with this supplement an "Administrative Notice" indicating that if this court rules against him in this case he will file "articles of impeachment" presumably against the undersigned. (*Id.* at 4.)

His fourth supplemental complaint adds as defendants Elkton police officers Morgan, Salsbury, Applegate, Luis, Walsworth, and Ms. LaSalsa.[3] (ECF No. 24 at 1.) He claims these defendants engaged in excessive force, harassment, and sexual harassment when in 2016 Petion was stopped because a call was received by police indicating Petion had a gun. Petion states he and his passenger were stripped and held at gunpoint naked and that the officers caused $2,000 in damage to him. (*Id.*) The resulting charge was a fifty-dollar citation for marijuana possession. (*Id.*) When he complained to a female lieutenant he claims he was told his complaint would not be filed. (*Id.*)

Additionally, Petion claims that on January 2, 2018, Officers Cox and Harris came into the jail where he was being detained for the purpose of intimidating him, proving he requires a protective order against them. (*Id.* at 1-2.) He further claims that Officer York filed new traffic charges against him and Officers Cox and Harris attached a warrant to it; he does not explain the significance of these actions. (*Id.*) He also claims that Officer Tittle lied in Circuit Court on

---

[3] These defendants were not served with the complaint.

January 3, 2018, and states that even though he was acquitted of one of the charges against him, Tittle's lies are "inflammatory and offensive." (*Id.* at 2.) Petion also includes an "Administrative Notice" with this pleading, again communicating his intent to file "articles of impeachment" if this court rules against him in this case. (*Id.* at 5.) The balance of the pleading consists of legal conclusions regarding the Elkton police. (*Id.* at 3-4.)

## Standard of Review

The defendants have moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551, 556 (D. Md. 2003). "There are two requirements for a proper Rule 12(d) conversion." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Baltimore*, 721 F.3d at 281.

The plaintiff had adequate notice that the defendants' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are in themselves sufficient indicia. *See Laughlin*, 149 F.3d at 260-61. Moreover, the plaintiff referred to the motion in his opposition brief as one for summary judgment. If the plaintiff had thought that he needed additional evidence to oppose summary judgment, Rule 56(d), which he has not invoked, afforded him the opportunity to seek further discovery through an affidavit. *See* Fed. R. Civ. P. 56(d); *see also Greater Baltimore*, 721 F.3d at 281 ("[The defendant] took 'the proper course' when it filed the Rule 56([d]) Affidavit, 'stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery.'") (citation omitted); *Laughlin*, 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate discovery when the nonmoving party failed to make an appropriate motion under Rule 56([d])). The plaintiff received two letters from the Clerk of the Court informing him of his right to enter additional evidence and providing him with the text of Rules 12 and 56. (Letters, ECF Nos. 29 and 30.) Therefore, the court will consider the affidavits and additional materials submitted by the parties and will treat the motion of the defendants as a motion for summary judgment.[4]

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[4] Some claims, however, do not require consideration of the additional evidence and are simply insufficient on their face.

247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## Analysis

### State Defendants

The complaint as to the Maryland State Police is barred by Eleventh Amendment immunity. Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* (citations omitted). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in

13

federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original). The complaint against the Maryland State Police shall be dismissed.

State defendants Sergeant Sean L. Harris, Trooper First Class Jacob R. Burno, Trooper First Class Michael A. York, Corporal Michael S. Cox, and Trooper First Class Charles M. Tittle move to dismiss the complaint against them. (Mot. Dismiss, ECF No. 26.) They assert that they are entitled to qualified immunity for the asserted federal claims under 42 U.S.C. §§1981, 1983 and 1985. (Memo. Supp. Mot. Dismiss at 7-8, ECF No. 26-1) "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . .qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The defense provides protection for public officials for mistakes of law, mistakes of fact, or a combination of the two. *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978)). Qualified immunity is a defense from suit, not simply liability, which is lost if a matter is improperly permitted to go to trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolution of whether an official is entitled to qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this Court. Although the Supreme Court's

decision in *Saucier v. Katz*, 533 U.S. 194 (2001) directed a rigid approach to the inquiries involved, the requirement that the two-prong analysis must be "considered in proper sequence" has since been revised. *Katz*, 533 U.S. at 200. Courts are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 818.

The first prong is whether ""[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id.* If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. "The 'answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds.'" *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) (quoting *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003)).

Petion's claim against defendant Bruno is that the officer stops him, uses harsh language, and on one unspecified occasion, trashed Petion's car. (ECF 4 at 2.) There are no facts alleged from which a viable claim against Bruno might be gleaned. Petion does not describe circumstances that would lead a reasonable trier of fact to conclude that Bruno stopped him without probable cause, nor does the use of harsh language alone amount to a constitutional rights violation. Further the claim that Bruno "trashed" Petion's car is simply too vague to even require Bruno to respond to the allegation, let alone permit the claim to move forward for a merits trial.

The claims raised against defendant Sgt. Harris are more numerous. Many of the claims center around statements allegedly made by Harris to Petion indicating that Petion should leave Cecil County; that his complaints against officers would not bring good results; and that Petion had swapped tags between vehicles. (Compl. at 4, 6.) Further, Harris is alleged to have interacted with Petion's probation officer in Pennsylvania, assisted in having a warrant served on Petion, and played a role in the seizure of Petion's ATV. Nothing alleged against Harris, taken as true, presents even a colorable claim of a constitutional rights violation.

Petion admits he switched tags between vehicles but claims it was done legally. There is no explanation as to why Petion believes Harris's statement regarding the tags somehow encroached on his constitutional rights. Nothing in the complaint indicates that the vehicle's tags were not in plain view and thus required a search warrant. *See U.S. v. Dunn*, 480 U.S. 294, 301-02 (1987). Further, the seizure of the ATV in itself does not state a constitutional claim; particularly where, as here, it is alleged to be evidence in a criminal case, *i.e.*, Petion alleged that Harris and his partner observed someone trying to steal it. *See Horton v. California*, 496 U.S. 128, 134-36 (1990). Petion's conclusory statement that the ATV was damaged after it was returned provides no factual basis for attributing that damage to Harris. Even so, damage to his property is a claim sounding in negligence, not a constitutional violation. Lastly, assuming Harris did assist Petion's probation officer in obtaining and serving a warrant on Petion, the claim fails to state any wrong-doing on the part of Harris or the probation officer. Such conduct does not come close to crossing a bright line into unconstitutional conduct. The claims against Harris must be dismissed.

The claim as to defendant Cox is less clear, as Petion admits he has "never directly harmed me." The allegation that Cox allowed criminal acts against Petion to occur unchecked in

his presence is vague at best as Petion describes no criminal conduct by any of the other defendants in which Cox was obligated to intervene. Cox is entitled to dismissal of the claims against him.

Defendant York is alleged to have used "racial undertones" in his dealings with Petion, but Petion does not describe what was said or how those statements violate his constitutional rights. The allegation that York fabricated probable cause for traffic stops of Petion is without sufficient factual detail to present a colorable Fourth Amendment claim. Petion does not provide dates when York is alleged to have stopped him without sufficient cause, nor does he explain which of the citations he provides as exhibits were issued by York. (*See generally*, Compl. Ex., ECF 1-1.)[5] While it appears that Petion's New Jersey driver's license was reinstated on May 17, 2017 (Compl. Ex. at 17), he was issued citations for driving without a license on January 16, 2017 (*id.* at 2), January 31, 2017 (*id.* at p. 10), and March 19, 2017 (*id.* at 6); and charged with driving on a suspended out of state license on February 8, 2017 (*id.* at 11), all dates prior to the reinstatement. There are two citations issued on August 1, 2017 and August 10, 2017, where Petion is charged with multiple violations, among them failure to display a license[6] and driving on a suspended out-of-state license. (*Id.* at 3-5.) Petion has failed to plead any facts to support his bald assertion that York made up reasons to pull his vehicle over. The claims against York will be dismissed.

Petion alleges that defendant Tittle lied under oath. (ECF 24.) There is nothing stated in the supplemental complaint regarding what Tittle allegedly lied about, why it was an important

---

[5] It cannot be discerned from the documents provided who issued the citations.

[6] Petion was charged with violation of Md. Code Ann., Transp. §16-112(c) in August of 2017 which requires "[e]ach individual driving a motor vehicle on any highway in this State [to] display the license to any uniformed police officer who demands it." This is a different provision from the one noted on citations issued before his New Jersey license was reinstated. The provision noted in the January and March citations is Md. Code Ann., Transp. §16-101(a) which prohibits anyone from driving in the State unless they hold a driver's license.

or material matter, or how it harmed Petion. The philosophical objection that Tittle's alleged lies under oath denigrate the courts, his badge, and the people of the community he serves while admirable as an idea, is not a basis for civil liability. Tittle is entitled to dismissal of the claims against him.

### County Defendants

The Elkton Police Department is not a properly named defendant for purposes of any of the federal statutes noted. It is not a person within the meaning of 42 U.S.C. § 1983[7] and cannot conspire to deprive someone of their constitutional rights under § 1985. If construed as a claim against the town of Elkton, Maryland, the claim fails to adequately allege a basis for liability.

In suing a municipal government and agency under 42 U.S.C. § 1983, a plaintiff must prove two elements to succeed in this claim. First, he must establish the existence of a constitutional violation on the part of the police officers. *See City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986) (jury's finding that a police officer inflicted no constitutional injury on the plaintiff removed any basis for municipal liability against city and members of police commission); *Temkin v. Frederick Cty Com'rs*, 945 F.2d 716, 724 (4th Cir. 1991) (§ 1983 claim of inadequate training or supervision cannot be established without a finding of a constitutional violation on the part of the person being supervised); *see also Dawson v. Prince George's County*, 896 F. Supp. 537, 540 (D. Md. 1995). Second, he must show that any constitutional violations were proximately caused by a policy, custom, or practice of the defendants. *See Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 691-94 (1978). Municipal policy arises from written ordinances, regulations, and statements of policy, *id.* at 690; decisions by municipal

---

[7] "Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . ." 42 U.S.C. §1983 (emphasis added).

policymakers, *Pembaur v. Cincinnati*, 475 U.S. 469, 482-83 (1986); and omissions by policymakers that show a "deliberate indifference" to the rights of citizens. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

Petion simply includes conclusory statements that Elkton, the town of North East, Maryland, as well as the Elkton Police Department, have policies that violate his constitutional rights and permitted police officers to engage in conduct that he characterizes as illegal. (ECF 5 at 4-5.) Petion does not provide any description of those policies or how they perpetuated the allegedly unconstitutional practices claimed. Therefore the claims against Elkton, North East, and the Elkton Police Department will be dismissed.

The remaining county defendants, Jason Hoffman and Lindsey Ziegenfuss, assert they are entitled to dismissal of the claims against them or summary judgment in their favor. Petion does not allege that Zeigenfuss has ever arrested or otherwise charged him with a violation of the law. The only claim asserted against Zeigenfuss is that she uses "racial tones" when speaking with Petion to show her disdain for him and offered an opinion about Petion and his family that was unkind. (ECF 4 at 3.) Further, Petion claims Zeigenfuss loudly told him to pick up his phone after a court hearing, causing Petion embarrassment. (*Id.*) These claims fall far short of conduct implicating a constitutional rights violation of any kind. The complaint as supplemented fails to state a claim upon which relief may be granted; Zeigenfuss is entitled to dismissal of these claims against her.

Hoffman issued a traffic citation to Petion on January 15, 2017, charging him with driving without a license, failure to display registration card upon demand, failure to display license upon demand, driving on a suspended out of state license, and use of a vehicle lamp projecting glaring and dazzling light; Petion demanded a jury trial. *See State of Maryland v.*

19

*Petion*, Case No. C-07-CR-17-000980 (Cecil Co. Cir. Ct. 2017). The trial is currently set for July 23, 2018. *See id.* at http://casesearch.courts.state.md.us/inquiry (last visited July 11, 2018). Petion's claims against Hoffman concerning the January 15, 2017 charges, or any other matter, are unclear at best. The allegations leveled specifically are that Hoffman uses his badge to give Petion tickets "of all sort," stalks Petion, and, after Petion demanded a jury trial, had an arrest warrant issued for Petion's arrest for driving without a license even though Petion had a valid license, and said that Petion fit the profile for a dealer. (ECF 4 at 3.) His general allegations of false imprisonment, malicious prosecution, intentional infliction of emotional distress, and violation of his right to equal protection leveled against "all defendants" do not illuminate which defendants' conduct are attributable to each cause of action claimed. (ECF 5 at 4-11.)

The specific allegations against Hoffman are indecipherable: issuing traffic tickets "of all sort" is a legitimate part of Hoffman's job and simply making a statement that Petion fits a profile, without more, does not constitute actionable conduct. Even the claim regarding the arrest warrant for driving without a license lacks clarity as Petion does not specify *when* the allegedly invalid arrest warrant was issued. To the extent, however, that the claim regarding the arrest warrant stems from the still pending January 15, 2017 charges, this court abstains from considering the merits of such a claim.[8] *See generally Younger v. Harris,* 401 U.S. 37 (1971) (federal courts must abstain from interfering in state proceedings where state proceedings are ongoing, implicate a vital state interest, and provide an adequate opportunity to raise the federal constitutional issue alleged in the federal lawsuit). "*Younger* is not merely a principle of abstention; rather, the case sets forth a mandatory rule of equitable restraint, requiring the

---

[8] While this claim may also be stayed pending the conclusion of the criminal case against Petion, *see Wallace v. Kato,* 549 U.S. 384, 393-94 (2007), there does not appear to be a statute of limitations issue involved in a false arrest claim based on the January 15, 2017 charges, thus abstention appears the more appropriate response to the existence of parallel state-court proceedings. *See Heck v. Humphrey,* 512 U.S. 477, 487-88, n.8 (1994) (noting abstention may be an appropriate response where criminal case is ongoing).

dismissal of a federal action." *Williams v. Lubin*, 516 F.Supp. 2d 535, 539 (D. Md. 2007) (internal quotation omitted). The claims against Hoffman shall be dismissed.

Remaining claims

Petion alleges, without including specific facts to support, a number of state law claims against both the served defendants and additional defendants whom he names in his supplemental complaint. (*See* ECF 24 at 1.) The additional Elkton police officers (Morgan, Salsbury, Applegate, Luis, Walsworth, and LaSalsa) allegedly engaged in excessive force, harassment, and sexual harassment in connection with a 2016 traffic stop where Petion and his passenger were strip-searched at gunpoint; the stop resulted in Petion receiving a fine for possession of marijuana. (*Id.*) Again, the claim lacks any specific allegation against each officer Petion claims to have been involved. As such it cannot be discerned who did what, when, and to whom.[9] To the extent Petion seeks to assert federal claims against these additional defendants, the complaint fails to include specific factual allegations against them that would support a colorable claim deserving of encouragement to proceed; these claims therefore will be dismissed without requiring service. *See* Fed. R. Civ. P. 8(a) (requiring a short and plain statement of the claim showing the pleader is entitled to the relief sought).

The state law claims Petion raises shall be dismissed without prejudice. When the federal claims are dismissed early in the case, federal courts should dismiss the state law claims without prejudice rather than retain supplemental jurisdiction. *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). In dismissing the conclusory state law claims for false arrest, malicious prosecution, intentional infliction of emotional distress, false imprisonment, in addition to any

---

[9] Petion includes conclusory statements that he is claiming unlawful arrest, excessive bail, violation of his First Amendment right to free speech, assault and battery, abuse of due process, racketeering conspiracy, and reckless endangerment against all defendants for acts occurring "on or about 2016-2017." (ECF 19 at 3.) Nothing contained in the factual narratives provided in the complaint as supplemented supports such claims.

other state law claims Petion may have intended to include, this court makes no statement regarding the wisdom or propriety of pursuing those claims in state court.

A separate order follows.

_____          _____
Date   7/23/18                 Catherine C. Blake
                               United States District Judge